# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

TRINA WRAY,                          )        CASE NO. 1:17CV0586
                                     )
              Plaintiff,             )        JUDGE PATRICIA A. GAUGHAN
                                     )
        v.                           )        MAGISTRATE JUDGE
                                     )        JONATHAN D. GREENBERG
NANCY A. BERRYHILL,                  )
        Acting Commissioner          )
        of Social Security,          )
                                     )        **REPORT AND**
              Defendant.             )        **RECOMMENDATION**

Plaintiff, Trina Wray, ("Plaintiff" or "Wray"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.    PROCEDURAL HISTORY

In March 2013 and April 2013, Wray filed applications for POD, DIB, and SSI, alleging a disability onset date of September 11, 2012 and claiming she was disabled due to chronic pancreatitis, a congenital heart defect, depression, anxiety neurosis, and high blood pressure. (Transcript ("Tr.") 287, 289, 360.)  The applications were denied initially and upon reconsideration, and Wray requested a hearing before an administrative law judge ("ALJ").  (Tr. 196, 200, 205, 208, 212.)

On July 1, 2015, an ALJ held a hearing, during which Wray, represented by counsel, testified.[2]  (Tr. 37-61.)  A supplemental hearing was held on October 6, 2015, during which Wray and a VE testified.  (Tr. 62-126.)  On January 27, 2016, the ALJ issued a written decision finding Wray was not disabled.  (Tr. 17-36.)  The ALJ's decision became final on February 10, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On March 21, 2017, Wray filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12 & 13.) Wray asserts the following assignments of error:

(1)    The ALJ failed to fully consider and give appropriate weight to the opinion of Social Security's consultative psychological examiner, resulting in a mental residual functional capacity assessment that is not supported by substantial evidence.

(2)    The ALJ failed to use appropriate standards in the evaluation of Ms. Wray's episodic impairment, necessitating remand to evaluate her intermittent medical limitations and their impact upon sustained work activity.

---

[2]    An impartial vocational expert ("VE") was present but did not testify.  (Tr. 37, 38.)

(Doc. No. 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Wray was born in January 1973 and was 42 years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 30.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a receptionist, administrative assistant, collections clerk, and flight attendant.  (Tr. 29.)

### B.    Medical Evidence[3]

On April 20, 2012,[4] Wray underwent a celiac plexus block procedure for her chronic pancreatitis.  (Tr. 532.)  Endosonographic imaging taken during the procedure revealed sonographic changes suggestive of moderate to severe chronic pancreatitis.  (Tr. 533.)

Wray thereafter presented to the emergency room on April 29, 2012, reporting epigastric pain and vomiting.  (Tr. 559.)  Wray was in moderate distress and had tenderness in her abdomen upon examination.  (Tr. 560.)  She was admitted to the hospital for symptom control.  (Tr. 561.)  The hospital physicians assessed Wray as having "acute on chronic pancreatitis" and she was discharged the next day.  (*Id.*)

Wray visited the emergency room again on May 3, 2012, after intentionally overdosing

---

[3]    The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[4]    The Court further notes this medical evidence relates to the period prior to the September 11, 2012 alleged onset date.  However, as Wray has cited to it in her brief, the Court finds it necessary to include it in the recitation of the medical evidence.

on Tylenol PM and ultram.  (Tr. 417, 425, 436.)  She denied suicidal ideation, and explained she was attempting to obtain "peace from all of this pain."  (Tr. 436.)  The emergency room physicians noted she had been on Paxil in the past, but was not currently following with any psychiatrist.  (Tr. 437.)  She reported feeling overwhelmed, and she exhibited poor insight and judgment.  (*Id*.)  She denied any death wishes, and made good eye contact.  (*Id*.)  The emergency room physicians determined she did not require inpatient care, and referred her for outpatient treatment.  (*Id.*)

Wray returned to the emergency room on May 30, 2012 for abdominal pain and constipation.  (Tr. 429.)  Her symptoms improved while in the emergency room, and she was discharged with antibiotics for a urinary tract infection.  (Tr. 430.)

On June 6, 2012, Wray visited Sumit Katyal, M.D., a pain management physician, for evaluation of her abdominal pain.  (Tr. 571.)  She indicated she had suffered from abdominal pain for the past four years.  (*Id.*)  She described her symptoms as worsening, and relayed she was on several pain medications.  (*Id.*)  On examination, Wray had a normal gait, and her joint range of motion was full and pain free in all four extremities.  (Tr. 575.)  Dr. Katyal recommended a bilateral celiac plexus block, which Wray subsequently underwent on June 15, 2012.  (Tr. 575, 578.)

Wray returned to Dr. Katyal for another celiac plexus block on July 17, 2012.  (Tr. 582.)  She indicated she had 25% pain relief following her last procedure.  (*Id.*)  She underwent a third celiac plexus block on August 14, 2012.  (Tr. 586.)  She reported 25-50% pain relief following her second block, and also indicated she had no additional "pain attacks."  (*Id.*)

Wray was then hospitalized from September 11 – 14, 2012 for "acute on chronic

4

pancreatitis."  (Tr. 483.)  She reported abdominal pain, nausea, and vomiting.  (*Id.*)  During her

hospital stay, her pain medications were adjusted and she was placed on a special diet.  (Tr. 484.)

At the time of discharge, her pain had improved and she was able to tolerate a regular diet.  (*Id.*)

On October 2, 2012, Wray returned to Dr. Katyal.  (Tr. 455.)  She indicated her

abdominal pain had improved about 50% since her last visit.  (*Id.*)  Dr. Katyal also noted she

"has not required any hospital visits since the block for acute pain 'episodes,' which is a

significant change for her."  (*Id.*)  She reported appetite loss, nausea, and vomiting, and a 10-15

pound weight loss.  (*Id.*)  Dr. Katyal noted Wray had fewer acute pain episodes, but still was

experiencing baseline pain and daily Percocet.  (Tr. 457.)  Dr. Katyal adjusted Wray's pain

medications, switching Percocet to Vicodin due to nausea.  (*Id.*)

On January 2, 2013, Wray visited Dr. Katyal's pain management practice, and treated

with nurse practitioner Stacy Mathews, CNP.  (Tr. 461.)  Wray described her symptoms as a

"sharp, stabbing pain in her mid-epigastric area," which "worsens during bowel movements and

at night."  (*Id.*)  She rated her pain as 9/10 and was tearful during the evaluation.  (*Id.*)  She

indicated she had lost employment after missing work for hospitalizations and abdominal pain.

(*Id.*)  On examination, she was well appearing and in no acute distress.  (Tr. 462.)  Her abdomen

was soft and tender to touch in the mid-epigastric area.  (*Id.*)  Ms. Mathews refilled Wray's

medications and referred her to a Chronic Pain Rehabilitation Program ("CPRP"), for a

"multifocal team approach for treating pain."  (Tr. 463.)

Wray saw Dr. Katyal again on February 13, 2013.  (Tr. 465.)  She indicated her pain had

been stable, but sharp and stabbing in nature.  (*Id.*)  She rated her pain as 3-4/10.  (*Id.*)  On

examination, she was well appearing and in no acute distress.  (Tr. 466.)  Her abdomen was soft

and tender to touch in the mid-epigastric area.  (*Id*.)  Dr. Katyal noted Wray's pancreatitis was

"well controlled after proceeding with bilateral celiac plexus block last year."  (*Id*.)  Wray

indicated her "opiate regimen is controlling pain well," and requested another celiac block for her

symptoms.  (*Id*.)  On March 5, 2013, Wray underwent another bilateral celiac plexus block.  (Tr.

471.)  At that time, Dr. Kaytal noted Wray had "obtained 75% relief. . . for months" after her last

procedure.  (*Id.*)

On May 10, 2013, Wray visited Walter Clark, M.D., a primary care doctor at Northeast

Ohio Neighborhood Health Service ("NEON").  (Tr. 624.)  Dr. Clark checked her blood pressure

and treated her for a urinary tract infection.  (*Id*.)  Wray reported she had been experiencing

insomnia and depression, which was improved with Paxil.  (*Id*.)  Dr. Clark refilled Wray's

medications, and also prescribed her Trazadone for insomnia.  (Tr. 626.)

On July 29, 2013, Wray visited Connections for a mental health diagnostic assessment

with Michelle Javorek, PCC-S.  (Tr. 654, 663.)  Wray indicated increased depression over losing

jobs due to her medical problems.  (Tr. 654.)  She relayed she was currently in the midst of a

divorce.  (*Id*.)  She reported volunteering "a lot for the county or planning events."  (*Id*.)  She

indicated she enjoyed volunteering, but did not "like the pressures of deadlines."  (*Id*.)  She also

reported she often read the bible, and had recently started a bible study group in her apartment

building.  (*Id*.)

During the assessment, Wray denied any consistent mental health treatment, but reported

a suicide attempt in April 2012.  (Tr. 656.)  She indicated she was currently taking Zoloft and

Paxil.  (*Id*.)  Wray reported she had trouble concentrating, which interfered with her volunteer

work.  (Tr. 658.)  She also indicated trouble controlling her emotions, poor sleep, depression, and

worry.  (*Id*.)  She denied suicidal ideation.  (*Id*.)  Wray described weekly episodes where she would have increased energy, as well as anger issues stemming from childhood sexual abuse.  (Tr. 654, 659.)

Ms. Javorek diagnosed Wray with major depressive disorder, recurrent, moderate; generalized anxiety disorder; and alcohol abuse unspecified.  (Tr. 661.)  She assessed a Global Assessment of Functioning ("GAF")[5] score of 41, indicating serious symptoms.  (*Id*.)  Ms. Javorek referred Wray for a psychiatric evaluation.  (*Id*.)

On October 8, 2013, Wray visited Dr. Carl Robson, M.D., a primary care doctor at NEON.  (Tr.  715.)  She indicated her current dosage of Oxycodone was not "quite enough" to control her abdominal pain.  (*Id*.)  Wray's physical examination was overall normal, though she did exhibit abdominal tenderness.  (Tr. 716, 717.)  Dr. Robson ordered labwork and prescribed Wray a two-month supply of pain medications.  (Tr. 717.)  He also renewed her Paxil and Trazodone prescriptions.  (*Id.*)

Wray returned to Dr. Katyal on October 21, 2013, indicating her pain had worsened since her last visit.  (Tr.  670.)  Dr. Katyal recommended another celiac plexus block, "as it has been over 6 months and she states she does get greater than 75% benefit for a few months with the procedure."  (Tr. 672.)  Wray subsequently underwent a bilateral celiac plexus block on October

---

[5]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

22, 2013.  (Tr. 676.)

On November 5, 2013, Wray visited the emergency room with a headache.  (Tr.  680.) She indicated she took Percocet for the pain, which made the headache worse.  (*Id*.)  She admitted she also drank some wine earlier in the day.  (*Id*.)  On examination, she was anxious and tearful.  (Tr. 682.)  The emergency room physicians ordered a head CT and administered IV fluids.  (*Id*.)  Her head CT was normal, with no evidence of an acute intracranial process.  (Tr. 706.)

Wray returned to Dr. Robson at NEON on February 24, 2014.  (Tr. 722.)  She indicated she had a flare of pancreatitis over the holidays, and resumed Oxycodone in January due to painful pancreatitis.  (*Id.*)  Her pancreatitis was "now improved."  (*Id.*)  Dr. Robson refilled Wray's medications, including Prozac, Trazodone, Pancrelipase, blood pressure medication, and Oxycodone.  (Tr. 724.)

On March 11, 2014, Wray had a chronic pain management evaluation with physician assistant Carrie Knaus, PA-C.  (Tr. 684.)  She indicated her pain had been gradually worsening, though her recent celiac plexus block provided 50% pain relief for about three months.  (*Id.*)  She indicated she was having intermittent episodes of sharp, stabbing pain.  (*Id.*)  Ms. Knaus noted Wray "used to have blocks monthly which gave her better and longer pain control."  (*Id.*)  Wray requested a functional capacity evaluation for her disability application.  (*Id.*)  Ms. Knaus then scheduled Wray for another bilateral celiac plexus block and a functional capacity evaluation. (Tr. 686.)   Wray underwent a bilateral celiac plexus block on March 18, 2014.  (Tr. 689.)

On March 28, 2014, Wray visited Dr. Roberto D. Chang, M.D., at the Cleveland Clinic's Pain Management Center for an evaluation.  (Tr. 696.)  Dr. Daniel J. Leizman was the attending

8

physician overseeing the evaluation.  (Tr. 700.)  Dr. Chang noted Wray had been receiving

periodic celiac plexus blocks, which provided "excellent relief" for 2-3 months at a time.  (Tr.

696.)  Wray indicated her pain would worsen in intensity and frequency after a few months, and

she would need another block.  (*Id.*)

On examination, Wray had a normal gait, and her upper and lower extremity strength was

normal and symmetric.  (Tr. 699.)  She had mild tenderness to palpitation in her epigastric

supraumbilical substernal area.  (*Id.*)  Dr. Chang concluded Wray "is capable of performing light

duty type work.  She may perform light duty type work, though intermittent absence of work may

be required due to ongoing medical treatment in the future."  (Tr. 700.)

Dr. Robson, Wray's primary care doctor at NEON, provided a letter regarding Wray on

April 24, 2014.  (Tr. 708.)  The letter provided:

> Trina Wray is currently under my medical care for several medical problems:
> high blood pressure, chronic pancreatitis, and anxiety neurosis.  She requires
> ongoing medications, which maintain medical stability.

(*Id.*)

Wray returned to Dr. Robson on June 27, 2014.  (Tr. 726.)  She indicated she had been

abstinent from alcohol, and was doing well on her medications.  (*Id.*)  She indicated she did not

always need her pain medications, but she did continue to have daily epigastric pain, with

varying intensity.  (*Id.*)  She relayed she was taking her pancreatic enzymes regularly to prevent

diarrhea.  (*Id.*)

Wray saw Dr. Robson again on August 18, 2014.  She denied drinking alcohol.  (Tr. 730.)

She indicated she still had nausea and vomiting, despite taking her pancreatic enzymes.  (*Id.*)

She returned to Dr. Robson on November 5, 2014, again reporting abstinence from alcohol.  (Tr.

9

734.)  Wray also indicated her Prozac and Trazadone was helpful for her depression.  (*Id*.)

On January 29, 2015, Wray reported to Dr. Robson she was having pain with eating, and felt it was time for another nerve block.  (Tr. 738.)  She had mild upper abdominal tenderness on examination.  (Tr. 739.)  Dr. Robson prescribed her Oxycodone and Ensure.  (*Id*.)  He also renewed her Prozac prescription.  (Tr. 740.)

Wray returned to Dr. Robson on May 18, 2015, and indicated she had not consumed any alcohol for about a year.  (Tr. 741.)  She continued to take her pancreatic enzymes, but she was still having chronic epigastric pain.  (*Id*.)  She reported her Oxycodone was helpful.  (*Id*.)  Her physical examination was overall normal, beyond some upper abdominal tenderness.  (Tr. 743.)  Dr. Robson renewed Wray's Oxycodone, Ensure, pancreatic enzymes, and Prozac.  (Tr. 743, 744.)

**C.     State Agency Reports**

**1.       Mental Impairments**

On October 18, 2011, Wray underwent a consultative psychological examination with David V. House, Ph.D.  (Tr. 408-413.)  This examination was in connection with a prior application for disability.  Wray reported depression and anxiety, and indicated she received counseling back in 2004 or 2005.  She indicated her current mental health treatment consisted of medications from her primary care doctor, Dr. Robson.  (Tr. 409.)  She reported crying spells, a suicide attempt at the age of 19, thoughts of death, mood swings, and insomnia.  (Tr. 410.)  Dr. House characterized her as "generally talkative" and "somewhat circumstantial."  (*Id*.)  During the examination, Wray did not demonstrate any significant long-term memory deficits, and she was able to perform a serial seven subtraction task.  (Tr. 411.)

10

Dr. House diagnosed Wray with Depressive Disorder, not otherwise specified, and Post Traumatic Stress Disorder. (Tr. 413.) He assessed a GAF score of 51, indicating moderate symptoms. (*Id*.) With regard to Wray's functional capabilities, Dr. House made the following conclusions:

1. **Describe the claimant's abilities and limitations in understanding and remembering to carry out instructions:** She does not demonstrate any significant deficits in either lone[sic] or short-term memory.

2. **Describe the claimant's abilities and limitations in maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks:** Her ability to concentrate and attend to task[sic] appears to be fairly stable and broadly within normal limits.

3. **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting:** She seems capable of conducting appropriate adequate relationships. She does not describe the people she hangs out with as friends, but as associates, but it appears that she has no issues to any significant degree of obstructionism or difficulties with authority figures or other employees or coworkers.

4. **Describe the claimant's abilities and limitations in appropriately responding to work pressures in a work setting:** Her emotional resources are reduced to some degree, but she will continue to maintain some capability for coping. The examiner does not believe at the current levels of stress that she would have any major difficulties or be especially dysfunctional or disruptive.

(Tr. 412.)

On May 7, 2013, Wray underwent another consultative psychological examination with David V. House, Ph.D. (Tr. 629-635.) At the outset, Dr. House noted he had seen her in 2011, and she was an "adequate historian" at that time. (Tr. 629.) He found her to be a "poor historian," however, for this examination. (*Id*.) Wray denied a current problematic use of drugs, but Dr. House felt she tended to "bypass her alcohol use to some degree." (Tr. 630.) Wray reported a suicide attempt in 2012, but denied any counseling. (Tr. 631.) She indicated she took

11

Paxil, Zolpidem, and Lorazepam.  (*Id.*)

During the examination, Dr. House noted Wray was "quite circumstantial in manner, but also somewhat hysteroid, labile and tearful.  It appears she is quite impulsive, especially regarding use of alcohol."  (*Id.*)  Wray described poor sleep, nightmares, poor appetite, and daily crying.  (Tr. 632.)  Wray also described monthly panic attacks, as well as flashbacks to past abuse.  (*Id.*)  Dr. House felt Wray's mood was "quite disturbed" as she was "crying throughout." (*Id.*)  Dr. House also noted mood swings during the evaluation.  (*Id.*)

Wray also described hearing voices on occasion, but denied any visual hallucinations. (Tr. 633.)  Dr. House did not think Wray appeared psychotic, but did note she "appear[ed] to be at a lower level of functioning than she was in 2011."  (*Id.*)  Wray's pace was fair, she was able to perform a serial seven subtraction task, and her long and short term memory were intact.  (*Id.*) Dr. House did note "in terms of concentration and attention, her ability to present her narrative was somewhat inconsistent, primarily due to crying."  (*Id.*)

Dr. House diagnosed Wray with Mood Disorder, not otherwise specified, Post Traumatic Stress Disorder, and Alcohol Abuse.  He noted there was not enough information to "advance a diagnosis of Personality Disorder Not Otherwise Specified, generally either with hysteroid or narcissistic features."  (Tr. 634.)  He assessed a GAF score of 41, indicating serious symptoms. (Tr. 635.)  With regard to Wray's functional capabilities, Dr. House made the following conclusions:

> **1.      Describe the claimant's abilities and limitations in
>          understanding and remembering to carry out instructions:**
>          Memory function remains intact, both long term and short term.
>          She should be able to follow instructions.
>
> **2.      Describe the claimant's abilities and limitations in maintaining**

**attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks:** At least for the most part, concentration and attention are at least broadly intact and, generally, she should be able to follow multi-step directions.  There are times when she is a bit more emotional which may interfere with her concentration, but these interruptions appear to be episodic.

3. **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting:** She seems rather socially isolated and does not seem to trust other people to a great degree.  That she has had difficulty interacting with supervisors in the past is not clear.  Her work history is, at least in a relatively high level as far as what types of jobs she has done, including use of computers, but her persistence on those jobs does not appear to be consistent.

4. **Describe the claimant's abilities and limitations in appropriately responding to work pressures in a work setting:** She is having more difficulties dealing with stress at this time than she was two years ago.  The evaluator would believe that, given her emotional responses currently, she would have a great deal of difficulty responding effectively to increased stress in the workplace.  She would likely be ineffective and dysfunctional.

(Tr. 634.)

On June 18, 2013, state agency physician Leslie Rudy, Ph.D. reviewed Wray's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 161.)  Dr. Rudy found Wray had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (*Id.*)  Dr. Rudy also completed a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 163.)  She adopted the mental restrictions set forth in the RFC assessed by the previous ALJ in the September 10, 2012 decision.[6]  (*Id.*)

---

[6]     The prior ALJ in the September 10, 2012 decision assessed the following RFC:

On November 13, 2013, state agency physician Patricia Semmelman, Ph.D., also reviewed Wray's medical records and completed a PRT.  (Tr. 176-177.)  Like Dr. Rudy, Dr. Semmelman found Wray had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (*Id*.)  Dr. Semmelman also completed a Mental RFC Assessment.  (Tr. 179.)  Like Dr. Rudy, she adopted the mental restrictions set forth in the RFC assessed by the previous ALJ in the September 10, 2012 decision.  (*Id.*)

### 2.      Physical Impairments

On May 29, 2013, state agency physician Teresita Cruz, M.D., reviewed Wray's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 146-165.)  She found Wray had the residual functional capacity to perform light work[7] except she

---

The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except:

- She can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps and stairs.
- She cannot work around dangerous machinery or unprotected heights.
- She can frequently balance, stoop, and kneel, and can occasionally crouch or crawl.
- She will be off task 5% of the time.
- She can perform simple and more complex tasks in an environment with routine changes in the work routine.  (Tr. 134.)

[7]      "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light

14

could never climb ladders, ropes, or scaffolds and could occasionally climb ramps and stairs.
(Tr. 163.)  She opined Wray could not work around dangerous machinery or unprotected heights,
and could frequently balance, stoop, and kneel, and could occasionally crouch or crawl.  (*Id*.)
Dr. Cruz explained her opinion was an adoption of the physical restrictions set forth in the RFC
assessed by the previous ALJ in the September 10, 2012 decision.  (*Id*.)

On December 1, 2013, state agency physician Leanne M. Bertani, M.D., reviewed Wray's
medical records and completed a Physical RFC Assessment.  (Tr. 170-195.)  Dr. Bertani also
adopted the physical restrictions set forth in the RFC assessed by the previous ALJ in the
September 10, 2012 decision.  (Tr. 191.)

**D.**      **Hearing Testimony**

During the July 1, 2015 hearing, Wray testified to the following:

- She lives with her mother, brother, and sister.  (Tr. 40.)  She has a vehicle, but does not drive often due to financial constraints.  (Tr. 41.)  She occasionally prepares meals, washes dishes, and does her laundry.  (Tr. 45.)  She does not attend church, but she reads the bible.  (Tr. 46.)  She watches religious television programming daily.  (Tr. 47.)

- She graduated from high school.  (Tr. 41.)  She attended Full Sail University, but did not complete the program.  (*Id*.)  She obtained good grades while attending Full Sail.  (*Id*.)

- She rarely smokes cigarettes.  (Tr. 42.)  She has not consumed alcohol for a "long time" and estimated her last use was in 2009 or 2010.  (*Id*.)

- She uses the bathroom about 10-15 times a day.  (Tr. 48.)  Small amounts of food will bother her stomach and result in a need to use the restroom.  (Tr. 48, 49.)
- She previously worked at Catholic Charities, but could not continue working there due to frequent restroom breaks.  (Tr. 51.)  She also worked as a

work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

receptionist at an accounting firm, an executive assistant at a newspaper, an executive assistant at the YMCA, a development assistant the Red Cross, and an assistant to the executive director at the Women's City Club.  (Tr. 51-57.)

During the October 6, 2015 hearing,[8] Wray testified to the following:

- She lives in the Doan Classroom Apartments.  (Tr. 67.)  She occasionally prepares meals, washes dishes, and does the laundry.  (Tr. 71.)  She goes grocery shopping, but she prefers to have someone with her when she shops.  (Tr. 72.)

- She enjoys watching religious television programming, and use the community room of her apartment building to watch television.  (Tr. 74.)  She reads the bible and religious books.  (Tr. 75.)  She does not socialize very often.  (Tr. 76.)  She does have friends in her apartment building.  (Tr. 77.)

- She does not drink alcohol often, but occasionally will "slip up" at special events.  (Tr. 69.)  She previously drank heavily when she was having marital problems.  (Tr. 69-70.)

- She has constant, daily pain due to her pancreatitis.  (Tr. 97, 98.)  She uses the bathroom 15 times a day and is afraid to eat.  (Tr. 98.)  She also throws up frequently, and will go days without eating.  (Tr. 99.)  Her doctors have recommended she follow a special diet, but she is unable to afford it.  (Tr. 101.)

- She takes pain medications and enzymes for her pancreatitis.  (Tr. 102.)  She has received nerve blocks, which did provide relief from her symptoms.  (Tr. 103.)  She would feel "great" for about a month, and then the pain would return.  (*Id.*)  She indicated her doctor only wants her to have a block 1-2 times a year.  (*Id.*)

- She takes Prozac for depression.  (Tr. 106.)  She is not currently in counseling.  (Tr. 113.)  She has short-term memory problems.  (Tr. 117.)  She often misplaces things.  (Tr. 118.)

- She recently began to experience "pass out spells."  (Tr. 107.)  She thinks they are related to her Prozac.  (Tr. 108.)  Her most recent spell was 2 weeks prior to the hearing, during which she fell and hit her head.  (Tr. 111.)

- She can lift and carry her twenty pound grandson.  (Tr. 113.)  She can stand for about twenty minutes.  (Tr. 115.)  She does not walk very much.  (*Id.*)  She is

---

[8]  A supplemental hearing was conducted as Wray arrived late for her July 1, 2015 hearing, and the ALJ did not have enough time to take complete testimony from Wray and a VE.  (Tr. 55.)

16

> comfortable sitting.  (*Id.*)  Recently, her hands have been shaking.  (Tr. 116.)
> She can climb stairs, but is tired afterwards.  (Tr. 117.)

The VE testified Wray had past work as a receptionist (D.O.T. #237.367-038),

administrative assistant (D.O.T. #219.362-010), a collection clerk (D.O.T. #241.357-010), and a

flight attendant (D.O.T. #352.367-010).  (Tr. 120-123.)  The ALJ then posed the following

hypothetical question:

> So I would have you assume a hypothetical person of the same age,
> education, and employment background as Ms. Wray who is able to lift and
> carry 20 pounds occasionally/10 pounds frequently; who can stand and walk
> for six hours and sit for six, but could use a sit/stand option every hour for
> about five minutes; they wouldn't have to leave the workstation during that
> time; this person could frequently balance; occasionally climb stairs and
> ramps, but no ladders, ropes, or scaffolding; occasionally stoop, kneel,
> crouch, and crawl; this person is reaching in all directions and can handle
> finger and feel, but would not be exposed to hazards such as unprotected
> heights or moving machinery; this person would perform simple, routine
> tasks with simple, short instructions; make simple decisions; have few
> workplace changes; and would not be required to work in a fast-paced
> production quota environment.

(Tr. 123.)

The VE testified the hypothetical individual would not be able to perform Wray's past

work.  (*Id.*)  The VE further explained the hypothetical individual would be able to perform other

representative jobs in the economy, such as housekeeper (light, unskilled, SVP 2); order filler

(light, unskilled, SVP 2); and office helper (light, unskilled, SVP 2).  (Tr. 124.)

The ALJ then asked the VE to consider the same hypothetical individual with the

additional limitation of missing work at least three times a month.  (*Id.*)  The VE testified there

would be no work for this hypothetical individual.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

17

time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while he/she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under

18

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Wray was insured on his/her alleged disability onset date, September 11, 2012, and remained insured through June 30, 2016, her date last insured ("DLI.")  (Tr. 22.)  Therefore, in order to be entitled to POD and DIB, Wray must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2.   The claimant has not engaged in substantial gainful activity since September 11, 2012, the alleged onset date.  (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: pancreatitis, hypertension, major depressive disorder, generalized anxiety disorder, and polysubstance abuse in reported remission.  (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of its listed impairments in

19

20 CFR Part 404, Subpart P, Appendix 1.  (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 406.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can stand, walk, sit for 6-hours, but could use a sit/stand option every hour for 5-minutes without leaving the workstation.  The claimant can frequently balance and occasionally stoop, kneel, crouch, and crawl.  She can occasionally climb ramps and stairs, but could never climb ladders, ropes, and scaffolds.  She can reach in all directions as well as handle, finger, and feel.  She must avoid exposure to hazards such as unprotected heights and moving machinery.  The claimant can perform simple, routine tasks with simple, short instructions; make simple decisions; have few workplace changes; and would not be required to work in a fast-paced production environment.

6.      The claimant is unable to perform any past relevant work.  (20 CFR 404.1565 and 416.965).

7.      The claimant was born on January **, 1973 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English.  (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 11, 2012, through the date of this decision. (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-31.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the

21

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.        First Assignment of Error: Weighing of Consultative Examiner Opinion**

In her first assignment of error, Wray argues the ALJ did not properly consider the

opinion of psychological consultative examiner Dr. House.  (Doc. No. 12 at 10.)  Specifically, Wray alleges the ALJ "cherry picked portions of Dr. House's opinion, did not address the findings in full, and failed to completely consider and weigh the examiner's opinion."  (*Id.*)  She maintains the ALJ "misstates the doctor's opinion regarding [her] ability to maintain concentration, persistence, and pace."  (*Id.*)  She further asserts the ALJ did not appear to give Dr. House's opinion any significant weight for "being a mental health specialist" or having seen her "on two separate occasions."  (*Id.* at 11.)  She argues "Dr. House's findings were minimized or simply misinterpreted."  (*Id.*)  Finally, Wray maintains the ALJ's review of Dr. House's report was "conclusory" and "leaves this Court with no means to conduct a meaningful review."  (*Id.* at 12.)

The Commissioner argues the ALJ properly evaluated Dr. House's opinion.  (Doc. No. 13 at 8.)  She asserts the ALJ provided several reasons for assigning some weight to Dr. House's more recent opinion.  (*Id.* at 9.)  The Commissioner notes the "state reviewing psychologists did not state limitations consistent with Dr. House's extreme conclusions," and the ALJ "properly assigned greater weight to their opinions."  (*Id.* at 9, 10.)  She concludes the "ALJ evaluated Dr. House's opinion, but reasonably determined after a holistic review of the evidence in the record as a whole that it was not entitled to full weight consistent with Sixth Circuit case law, and agency regulations and rulings."  (*Id.* at 10.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified

23

physicians, psychologists," ALJs must consider their findings and opinions.  *Id.*  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

As noted *supra,* Wray underwent two psychological consultative examinations with Dr. House.  The first one, which took place on October 18, 2011, was in connection with a prior application for disability.  (Tr. 408-413.)  Wray then saw Dr. House for another consultative examination, on May 7, 2013, in connection with the currently pending application for disability. (Tr. 629-635.)

Based upon his May 2013 examination, Dr. House assessed a GAF score of 41, indicating serious symptoms.  (Tr. 635.)  With regard to Wray's functional capabilities, Dr. House made the following conclusions:

> **1.    Describe the claimant's abilities and limitations in understanding and remembering to carry out instructions:**
> Memory function remains intact, both long term and short term. She should be able to follow instructions.
>
> **2.    Describe the claimant's abilities and limitations in maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks:**
> At least for the most part, concentration and attention are at least broadly intact and, generally, she should be able to follow multi-

step directions.  There are times when she is a bit more emotional which may interfere with her concentration, but these interruptions appear to be episodic.

3.    **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting:** She seems rather socially isolated and does not seem to trust other people to a great degree.  That she has had difficulty interacting with supervisors in the past is not clear.  Her work history is, at least in a relatively high level as far as what types of jobs she has done, including use of computers, but her persistence on those jobs does not appear to be consistent.

4.    **Describe the claimant's abilities and limitations in appropriately responding to work pressures in a work setting:** She is having more difficulties dealing with stress at this time than she was two years ago.  The evaluator would believe that, given her emotional responses currently, she would have a great deal of difficulty responding effectively to increased stress in the workplace.  She would likely be ineffective and dysfunctional.

(Tr. 634.)

In the decision, the ALJ discussed Dr. House's May 2013 opinion as follows:

Additionally, the Agency consultative psychological examiner evaluated the claimant and found her ability to maintain concentration, persistence, and pace to perform simple and multi-step tasks remained intact.  (Exhibit B7F, pg. 7).  However, the examiner found the claimant was socially isolated and would have difficulty responding effectively to increased workplace stressors.  (*Id*.)  The undersigned accords some weight to this opinion and Global Assessment of Functioning (GAF) score, but finds the longitudinal record, along with the claimant's testimony, supports that she is only mildly limited in her ability to interact with others.  (Hearing Testimony).  Nonetheless, the undersigned limited the claimant to the performance of simple, routine tasks with short instructions and simple decision-making in an environment with few workplace changes and no fast-paced production requirements.

(Tr. 28.)  The ALJ then discussed Dr. House's October 2011 opinion as follows:

The undersigned adopts the weight accorded to the Agency consultative examiner's opinion and GAF score rendered in 2011 as part of the claimant's prior file.  (Exhibits B1A, B1F).

25

(Tr. 29.)

The ALJ also referenced Dr. House's observations and findings several other times in the body of the decision, noting her activities of daily living and reported social activities. (Tr. 24.) The ALJ also provided a more detailed discussion at step three when determining Wray had moderate difficulties with concentration, persistence, or pace. (*Id.*) Specifically, the ALJ noted:

> Additionally, the claimant was able to perform mathematic calculations and recall digits during her consultative psychological examination. (Exhibit B7F, pg. 6). Moreover, the claimant subsequently displayed logical thought processes and good insight. (Exhibit B8F, pg. 31). Consequently, the Agency consultative psychological examiner found that the claimant's ability to maintain concentration, persistence, and pace to perform simple and multi-step tasks remained intact. (*Id*. at 7). Thus, the claimant's ability to concentrate during her examinations, complete activities of daily living, and respond appropriately to questions indicates that her difficulties in this area are neither marked nor extreme. (*Id*.).[sic]

(Tr. 24-25.)

The ALJ then formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can stand, walk, sit for 6-hours, but could use a sit/stand option every hour for 5-minutes without leaving the workstation. The claimant can frequently balance and occasionally stoop, kneel, crouch, and crawl. She can occasionally climb ramps and stairs, but could never climb ladders, ropes, and scaffolds. She can reach in all directions as well as handle, finger, and feel. She must avoid exposure to hazards such as unprotected heights and moving machinery. **The claimant can perform simple, routine tasks with simple, short instructions; make simple decisions; have few workplace changes; and would not be required to work in a fast-paced production environment.**

(Tr. 25-26) (emphasis added).

The Court finds the ALJ properly evaluated Dr. House's opinion. As noted above, the ALJ discussed Dr. House's May 2013 examination findings and expressly acknowledged his

26

opinions regarding Wray's mental limitations.  The ALJ assigned "little weight" to Dr. House's

May 2013 opinion and provided several reasons for doing so.  Specifically, the ALJ found the

"longitudinal record, along with the claimant's testimony, supports that she is only mildly limited

in her ability to interact with others."  (Tr. 28.)  A review of the decision indicates the ALJ

thoroughly evaluated Wray's testimony and treatment notes regarding her social activities prior

to discussing Dr. House's opinion.  (Tr. 24.)  In particular, the ALJ noted:

> Although the claimant alleges that she has difficulty getting along with
> others, she reported an ability to get along with her spiritual advisors,
> doctors, and social workers.  (Exhibit B7E).  Additionally, the claimant
> testified that she shops in stores with assistance, occasionally drives,
> watches television in her community center, attends her doctor's
> appointment, and occasionally counsels her neighbors with coping with
> their problems, which indicates an ability to tolerate others.  (Exhibit B7E,
> B7F pg. 3, B8F pg. 19, Hearing Testimony).  In addition, the claimant's
> treating mental health professional noted that she was cooperative and
> maintained good eye contact.  (Exhibit B8F, pg. 31).

(Tr. 24.)

These reasons are supported by substantial evidence.  A review of the record and

testimony confirms Wray regularly interacts with others, volunteers, and "care[s] a lot about

people."  (Tr. 654.)  She started a bible study group in her apartment complex.  (*Id.*)  During her

hearing, Wray testified she uses the community room of her apartment building to watch

television.  (Tr. 74.)  While she does not socialize very often, she has friends in her apartment

building.  (Tr. 76-77.)

Wray asserts, however, the ALJ "cherry picked" Dr. House's opinion.  (Doc. No. 12 at

10.)  Specifically, she argues the ALJ "misstates the doctor's opinion regarding [her] ability to

maintain concentration, persistence, and pace" and did not discuss Dr. House's conclusion she

"will have great difficulty responding to increased stress in the workplace and she 'would likely

27

be ineffective and dysfunctional.'" (*Id.* at 10, 11.)  The Court rejects this argument.  Dr. House opined Wray's "concentration and attention are at least broadly intact and, generally, she should be able to follow multi-step directions." (Tr. 634.)  He then noted, in addition, that, "[t]here are times when she is a bit more emotional which may interfere with her concentration, but these interruptions appear to be episodic." (Tr. 634.)  In the decision, the ALJ specifically acknowledged Dr. House had found Wray's "ability to maintain concentration, persistence, and pace to perform simple and multi-step tasks remained intact." (Tr.  25.)  The ALJ then accounted for this in the RFC.

Wray argues this is a "misstate[ment]" of Dr. House's opinion.  (Doc. No. 12 at 10.) The Court disagrees.   Dr. House specifically found Wray's concentration was intact and she could follow multi-step instructions.  (Tr. 634.)  The ALJ noted this portion of the opinion in his decision.  (Tr. 25.)  The ALJ's failure to mention a possible *intermittent* issue with concentration is not a misstatement of Dr. House's opinion.  Rather, the ALJ is accounting for the *continuous* limitations set forth by Dr. House in his opinion.  While Wray very well may have, at times, had poor concentration, Dr. House acknowledges these instances are "episodic" in nature.  (Tr.634.) Thus, the ALJ correctly elected not to add this specific limitation, in light of the fact Dr. House opined it was sporadic in nature.

Moreover, while the ALJ did not explicitly list Dr. House's opinion regarding Wray's ability to respond to stress in the decision, it is clear he considered it, as he went on to limit Wray to "an environment with few workplace changes and no fast-paced production requirements." (*Id.*)  Thus, the Court finds the ALJ properly accounted for Dr. House's findings of poor stress tolerance.

28

Moreover, even if the ALJ's RFC deviates in some respects from Dr. House's opinion, this alone is not grounds for reversal.  *See Dykes ex rel. Brymer v. Barnhart,* 112 Fed. App'x 463, 468 (6th Cir. 2004) ("the ALJ's failure in the present case to explain why he disregarded part of the opinion of the consultative examiner does not warrant remand.").  Notably, Wray fails to specify exactly what additional limitations she believes should have been in the RFC, in order to reflect Dr. House's opinion regarding workplace stress.  Furthermore, Wray cites no treatment records which would support greater limitations.

Wray next maintains the ALJ, when weighing the opinion, did not properly account for Dr. House's status as a "mental health specialist" who saw her on two different occasions.  (Doc. No. 12 at 11.)  Wray references the factors listed at 20 CFR §404.1527(d),[9] arguing because Dr. House saw Wray at two different consultative examinations, this should have "favorably impacted" the ALJ's review of the opinion.  (*Id.*)

Wray appears to be arguing since Dr. House saw Wray twice, as opposed to once, his opinion should automatically be afforded more deference than normally given to consultative examiners.  Generally, if the medical source is a consultative examiner, the ALJ is not required to give the same level of deference as accorded a treating source.  *Puckett v. Colvin*, 2014 WL 1584166, at *9 (N.D. Ohio April 21, 2014).  It is undisputed Dr. House is not a treating source. Dr. House did see Wray twice, once in 2011 and once in 2013, both times for consultative

---

[9]     Under the regulations, an ALJ must consider several factors when weighing a medical opinion. These factors include: 1) examining relationship, 2) treatment relationship, 3) supportability, 4) consistency with the record, 5) specialization of the source, 6) other factors, such as understanding the disability programs and knowledge of the other information in the case record.  *See* 20 C.F.R. §404.1527(c)(1)-(6).

examinations.  However, at no point did Dr. House establish a treating relationship with Wray.  Although the ALJ did not mention or acknowledge Dr. House saw Wray on two separate occasions, the ALJ was not required to do so.  While the ALJ is charged with considering the factors set forth at 20 CFR §404.1527(d) when evaluating medical opinion evidence, the ALJ is not required to articulate specific findings as to each of these factors.  Indeed, neither the regulations or Sixth Circuit case law requires an "exhaustive factor-by factor analysis."  *Francis v. Comm'r Soc. Sec*., 414 F. App'x 802, 804 (6th Cir. 2011).

In sum, the ALJ acknowledged Dr. House's opinion and articulated several reasons for discounting it, including its supportability and consistency with the other evidence in the record.  The ALJ also incorporated limitations into the RFC to account for Dr. House's observations regarding stress tolerance and concentration.  The analysis provided by the ALJ satisfies the explanation requirements for non-treating, examining physicians.

Accordingly, the Court finds the ALJ did not err in the weighing of Dr. House's opinion.   Wray's first assignment of error is without merit.

**B.**      **Second Assignment of Error: RFC/Evaluation of Episodic Impairments**

In her second assignment of error, Wray argues the RFC "is premised upon legal error" as the "medical record demonstrates intermittent functional limitations which impede [her] ability to sustain work activity at any level."  (Doc. No. 12 at 12.)  Wray argues the medical evidence indicates she has "episodic difficulties with concentration," and requires "intermittent absence of work," and "extra bathroom and rest breaks."  (*Id*. at 13.)  Wray maintains the ALJ's RFC "fails to account for or even discuss her intermittent physical and mental restrictions which preclude sustained work activity."  (*Id*. at 14.)  She asserts the VE testimony indicates all work

would be precluded for an individual who had "difficulty maintaining regular attendance." (*Id.*)

The Commissioner asserts the ALJ fully accounted for all of Wray's limitations. (Doc. No. 13 at 13.) She maintains the ALJ "engaged in a lengthy, thoughtful discussion of the medical evidence" and "adequately considered Plaintiff's impairments, singly and in combination." (*Id.* at 11.) The Commissioner argues the ALJ did consider the evidence regarding potential absences, and properly discounted it based upon evidence which "undercuts Plaintiff's allegations of intermittent pain and bathroom use frequency." (*Id.*) She asserts Wray's "contention that she had intermittent concentration deficits resulting from her mental impairments is misplaced, given the ALJ's generous accommodations in the RFC." (*Id.* at 12.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he

'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at \*7, 1996 SSR LEXIS 5, \*20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Wray suffered from the severe impairments of pancreatitis, hypertension, major depressive disorder, generalized anxiety disorder, and polysubstance abuse in reported remission.  (Tr. 23.)  After determining Wray's impairments did not meet or equal a Listing, the ALJ went on at step four to consider the medical and opinion evidence regarding Wray's impairments.  (Tr. 23 - 29.)  The ALJ discussed Wray's allegations, her treatment course, and the objective findings.  (Tr. 27-28.)

Of particular relevance herein, the ALJ discussed Wray's pancreatic symptoms and related treatment as follows:

> By 2013, her treating physician noted that the claimant's pancreatic symptoms were well controlled.  (Exhibit B3F pg. 17, B4F pag. 13).  In support of this finding, the claimant admitted that her associated pain was stable and denied experiencing any fevers, chills, night sweats, chest pain, edema, palpitations, worsened night pains, unintentional weight loss, changes in bowel habits, or bladder or bowel incontinence.  (Exhibit B3F pgs. 12-13, 16, B4F pgs. 13-14, 29-30, B6F pg. 5).  Upon examination, the claimant's[sic] was negative for abdominal tenderness.  (Exhibits B6F pg. 6).  Although the claimant later complained of experiencing chronic pain, she admitted that she was pleased with her pain management regimen, further stating that the prior pain blocks provided greater than 75% relief.  (Exhibit B9F, pg. 3).  Consequently, the claimant was administered bilateral celiac plexus blocks, which she reported provided relief.  (*Id*. At 8, 20-21).

> In fact, the claimant subsequently denied experiencing any abdominal
> pain, fevers, chills, night sweats, worsened night pains, unintentional
> weight loss, or bladder or bowel incontinence.  (Exhibit B9F, pgs. 11, 15).
> Although the claimant displayed mild tenderness to touch in the epigastric
> supraumbilical substernal, her abdomen remained soft without any
> rebound or guarding.  (*Id*. at 30).  In addition, the claimant reported an
> improvement in her pain such that she did not require constant medication.
> (Exhibit B11F, pg. 18).

(Tr. 27.)  The ALJ then discussed the opinion of Dr. Daniel Leizman, an examining physician, as

follows:

> Consequently, the claimant's treating physician,[10] Dr. Daniel Leizman,
> opined that she was capable of performing light work, which the
> undersigned accords significant weight as the claimant's strength and range
> of motion remained intact.  (Exhibit B9F, pgs. 30-31).  Dr. Leizman further
> opined claimant may have intermittent absences due to ongoing treatment
> in the future.  The undersigned gives little weight to this portion of Dr.
> Leizman's opinion.  It is vague and speculative, as "intermittent" is not
> defined, and the type and frequency of treatment is not specified.  In
> addition, Dr. Carol Robinson[11] noted that the claimant's conditions were
> medically stable with use of prescribed medication, which the undersigned
> also accords considerable weight.  (Exhibit 10F).  Thus, the undersigned
> concludes the longitudinal records supports that the claimant is capable of
> performing reduced light work as defined in the above residual functional
> capacity.

(Tr. 27-28).

The ALJ also discussed Wray's mental health allegations and medical evidence relating

---

[10]    While the ALJ referred to Dr. Leizman as a "treating physician," a review of the
record reveals Dr. Leizman did not constitute a "treating physician" for purposes
of social security regulations.  Rather, Dr. Leizman was the attending physician
who oversaw the one-time physical examination conducted by Dr. Roberto
Chang.  (Tr. 700.)

[11]    The Court notes the ALJ referred to this doctor as Dr. Carol Robinson in the
decision. However, upon careful review of the record, it appears the doctor
referenced is actually Dr. Carl A. Robson, Wray's primary care physician. (Tr.
708.)

33

to such allegations.  (Tr. 28.)  The ALJ noted Wray had alleged "problems sleeping, fatigue,

depressed mood, and difficulty remembering, completing tasks, and concentrating."  (*Id.*)  He

then discussed the medical evidence as follows:

> However, one-month after her alleged onset of disability, the claimant
> denied experiencing any sleep disturbances, mood disorder, or recent
> psychosocial stressors.  (Exhibit B3F, pgs. 7, 13, 17).  Furthermore, upon
> examination, the claimant's mood and affect were appropriate and she
> demonstrated normal orientation and alertness.  (Id.).[sic]  By 2013, the
> claimant admitted that her medications helped her insomnia and
> depression.  (Exhibits B6F pg. 5, B11F pg. 26).  Thereafter, the claimant
> admitted that she was abstinent from alcohol and doing well on her
> medications.  (Exhibit 11F, pgs. 18, 22, 26, 33).  Consequently, she
> continued to exhibit full orientation as well as appropriate mood and affect
> in 2015.  (Id. at 35).

(*Id.*)  The ALJ also considered Dr. House's May 2013 psychological consultative examination,

noting Dr. House had found "her ability to maintain concentration, persistence, and pace to

perform simple and multi-step tasks remained intact."  (*Id.*)   The ALJ further noted Dr. House

had found Wray was "socially isolated and would have difficulty responding effectively to

increased workplace stressors."  (*Id.*)  The ALJ then assigned this opinion "some weight,"

reasoning the "longitudinal record, along with the claimant's testimony, supports that she is only

mildly limited in her ability to interact with others."  (*Id.*)

The ALJ also provided a detailed discussion regarding Wray's concentration,

persistence, or pace when determining she did not meet a Listing.  (Tr. 24-25.)  The ALJ noted

Wray, during the consultative examination, was "able to perform mathematic calculations and

recall digits," and Dr. House had found "the claimant's ability to maintain concentration,

persistence, and pace to perform simple and multi-step tasks remained intact."  (*Id.*)

The ALJ formulated the following RFC:

34

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can stand, walk, sit for 6-hours, but could use a sit/stand option every hour for 5-minutes without leaving the workstation.  The claimant can frequently balance and occasionally stoop, kneel, crouch, and crawl.  She can occasionally climb ramps and stairs, but could never climb ladders, ropes, and scaffolds.  She can reach in all directions as well as handle, finger, and feel.  She must avoid exposure to hazards such as unprotected heights and moving machinery.  The claimant can perform simple, routine tasks with simple, short instructions; make simple decisions; have few workplace changes; and would not be required to work in a fast-paced production environment.

(Tr. 25-26.)

The Court finds the ALJ's RFC determination is supported by substantial evidence. With regards to Wray's pancreatic insufficiency and abdominal pain, the ALJ acknowledged Wray's mild abdominal tenderness and reports of chronic pain.  (Tr. 27.)  However, the ALJ noted Wray often reported her symptoms were stable, and her doctors had indicated her condition was "well controlled."  (*Id.*)  The ALJ also noted Wray had undergone bilateral celiac plexus blocks, which provided significant relief.  (*Id.*)  The ALJ discussed that Wray no longer required constant medication, due to an improvement in her pain.  (*Id.*)

Moreover, the ALJ acknowledged examining physician Dr. Chang's[12] conclusion Wray was "capable of performing light work" but "may have intermittent absences due to ongoing treatment in the future."  (Tr. 27-28.)  The ALJ then, consistent with Dr. Chang's opinion, restricted Wray to a range of light work.  (Tr. 25-26.)  The ALJ did not adopt Dr. Chang's conclusion Wray would have "intermittent absences due to ongoing treatment."  However, the

---

[12]     While the ALJ indicates this opinion was Dr. Leizman's, the record indicates it was actually Dr. Chang who provided this opinion.  (Tr. 700.)

35

ALJ properly explained[13] his rejection of this portion of Dr. Chang's opinion, noting it was "vague and speculative," as "'intermittent' is not defined, and the type of frequency of treatment is not specified." (Tr. 28.)  The ALJ also noted a treating source, Dr. Carl Robson, found Wray's condition was "medically stable with use of prescribed medication." (*Id.*)

Substantial evidence supports the ALJ's conclusion.  In June 2012, several months prior to the alleged onset date of disability, Wray established with pain management physician Katyal. (Tr. 571.)  She then underwent a series of three bilateral celiac plexus blocks from June to August 2012, after which she reported 25-50% relief.  (Tr. 578, 582, 586.)  Wray did have an uptick in abdominal pain, nausea, and vomiting in September 2012, which required a three-day hospitalization.  (Tr. 483.)  However, by October 2012, she reported "significant relief" from her pain symptoms.  (Tr. 457.)  She did continue to have some degree of pain, along with nausea and vomiting.  (*Id.*)

In January 2013, Wray indicated it was becoming difficult to deal with her pain, and she rated her pain as a 9/10.  (Tr. 461.)  However, on examination, she was well appearing, and in no acute distress.  (Tr. 462.)  Her abdomen was soft, but tender to touch.  (*Id.*)  In February 2013, Dr. Katyal noted Wray's pancreatitis was "well controlled after proceeding with bilateral celiac plexus blocks last year," and Wray had indicated her "opiate regimen was controlling pain well." (Tr. 466.)  She underwent another celiac plexus block in March 2013.  (Tr. 471.)  At that time,

---

[13]     Dr. Chang was not Wray's treating physician and, therefore, the ALJ was not required to satisfy the "good reasons" requirement in rejecting his opinion.  *See Taylor v. Colvin*, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013) ("Notably, the procedural 'good reasons' requirement does not apply to non-treating physicians").

she indicated she had 75% pain relief for months following her last series of blocks.  (*Id.*)  In October 2013, Wray underwent another celiac plexus block, and Dr. Katyal noted "she gets greater than 75% benefit for a few months" following this type of procedure.  (Tr. 672, 676.)

Wray underwent another block in March 2014.  (Tr. 689.)  During an evaluation with Dr. Chang a few weeks later, the doctor noted these blocks "provide excellent relief for her for 2-3 months at a time."  (Tr. 696.)  On examination, her upper and lower extremity strength were normal and symmetric, and she had mild tenderness in her epigastric supraumbilical substernal area.  (Tr. 699.)  Wray continued to do well, and in June 2014, indicated she did not need pain medications "constantly" but did have chronic epigastric pain which varied in intensity.  (Tr. 726.)

Despite Dr. Chang's vague assertion Wray would require "intermittent absences," a review of the treatment notes indicates she was undergoing celiac plexus blocks, at most, three times a year.   These same blocks would then provide significant relief from her pain for several months at a time.  Moreover, the objective findings upon examination were often underwhelming, with mild abdominal tenderness and the appearance of no acute distress.  Thus, the ALJ's decision to not incorporate a need for absences in the RFC is supported by substantial evidence.

Wray maintains, however, remand is required because the ALJ did not incorporate her need for extra bathroom and rest breaks into the RFC.  (Doc. No. 12 at 13, 14.)  The Court rejects this argument.  Wray bases this assertion completely on her own testimony regarding her symptoms.  (*Id.*)  She points to no objective evidence or medical source opinion documenting a need for extra bathroom and rest breaks.  A review of the medical evidence does indicate she

reported nausea, diarrhea, and vomiting to her physicians.  (Tr. 730, 726.)  However, the medical

evidence does not indicate these symptoms were occurring at a frequency which would preclude

work activity or require a unreasonable amount of breaks.  Beyond her own testimony, there is no

objective medical evidence to support her assertion additional limitations should have been

incorporated into the RFC.

With regard to Wray's psychological impairments, the ALJ acknowledged Wray's

various mental health allegations, but found these symptoms would not preclude the

"performance of simple, routine tasks with short instructions and simple decision-making in an

environment with few workplace changes and no fast-paced production requirements."  (Tr. 28.)

In reaching this conclusion, the ALJ relied on the following evidence: 1) normal psychological

examination findings, 2) effectiveness of her psychotropic medications, 3) portions of the

consultative examiner opinion.  (Tr. 28.)  The ALJ also discussed, in detail, Wray's wide range

of daily activities, her social activities, and her ability to perform mathematic calculations and

recall digits during her consultative examination.  (Tr. 24.)

Substantial evidence supports the mental portion of the ALJ's RFC finding.  Wray was

not receiving any regular treatment with a mental health professional during the relevant period.

Rather, she received medications for sleep and depression from her primary care doctor, Dr.

Robson.  (Tr. 626, 708, 724, 734.)  She indicated her medications were helping her depression.

(Tr. 734.)  Wray did overdose on her medications in May 2012, but she denied she was

attempting suicide, and did not require an inpatient stay at the hospital.  (Tr. 436, 437.)  She did

undergo a diagnostic assessment at Connections, a mental health practice, in July 2013.  (Tr.

654.)  At that time, she reported depression, anger, poor sleep, and difficulty concentrating.  (Tr.

38

654, 658, 659.)  She also reported two suicide attempts, one in April 2012[14] and another "years ago."  (Tr. 656.)  However, she also indicated volunteer work, regular interaction with family members, and reading the bible.  (Tr. 654.)  Moreover, she never followed up at Connections for any further treatment after this diagnostic assessment.  These treatment records provide substantial evidence in support of the ALJ's conclusion that, while Wray does suffer from some degree of mental impairment, she still retains the ability to perform simple, routine tasks, in a work environment with few changes and no past-paced production requirements.

As noted *supra,* Wray underwent a consultative examination with Dr. House in May 2013.  (Tr. 629-635.)  During the examination, Wray was labile and tearful, and described poor sleep, nightmares, poor appetite, and daily crying.  (Tr. 631-632.)  Dr. House felt Wray's mood was "quite disturbed" as she was "crying throughout."  (*Id*.)  Wray's pace was fair, she was able to perform a serial seven subtraction task, and her long and short term memory were intact.  (Tr. 633.)  Dr. House noted "in terms of concentration and attention, her ability to present her narrative was somewhat inconsistent, primarily due to crying."  (*Id*.)

Dr. House then provided an opinion regarding Wray's mental limitations.  (Tr. 634.)  Wray essentially argues this opinion, particularly the portion describing episodic concentration deficits, should have been completely incorporated into the RFC.  She summarily notes "Dr. House's consultative examination found that she would have episodic difficulties with concentration, did not have a consistent ability to persist [and] would likely be ineffective and

---

[14]      The Court notes Wray denied any suicidal ideation when she visited the emergency room on May 3, 2012, after intentionally overdosing on Tylenol PM and Ultram.  (Tr. 417, 425, 436.)  There is no record of her April 2012 suicide attempt.

39

dysfunctional." (Doc. No. 12 at 13.)  The Court finds this argument to be without merit.  As discussed thoroughly above, the ALJ properly addressed and accounted for this opinion, and well satisfied the explanation requirements for non-treating, examining physicians.

Although Wray cites evidence from the record she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  In the instant case, the ALJ clearly articulated his reasons for finding Wray capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence.

Accordingly, Wray's argument that the ALJ erred in formulating the RFC is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

  *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 10, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of**

this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).